**WO**                          NOT FOR PUBLICATION

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-14-01466-PHX-JJT |
|---|---|
| Plaintiff, | **ORDER** |
| v. | |
| Denise Robertson, | |
| Defendant. | |

At issue are Defendant's First Motion for Acquittal, First Motion for New Trial, First Motion for Leave to Supplement Motions (Doc. 130),[1] to which the Government filed Response (Doc. 132) and Defendant filed a Reply (Doc. 136); Defendant's Supplemental Motion for New Trial, Supplemental Motion for Acquittal (Doc. 164), to which the government filed a Response (Doc. 166), Defendant filed a Reply (Doc. 168) and a Supplemental Reply (Doc. 171),[2] and the government filed a Surreply (Doc. 176); and Defendant's Motion for Leave to File Exhibits Inadvertently not Attached to Supplemental Reply (Doc. 175). No party requested a hearing on the Motions and the Court concludes the matter is suitable for decision without oral argument. For the reasons

---

[1] Defendant appears to have filed a second version of her Motion for Acquittal or New Trial at Doc. 170. The Court has reviewed it in comparison to her First Motion (Doc. 130) and Supplemental Motion (Doc. 164) to ensure that all of Defendant's arguments are considered and before the Court.

[2] Defendant also filed a Motion for an extension of time to file a Supplemental Reply in support of her Supplemental Motion for acquittal or new trial (Doc. 169), which the Court intended to grant but for which it did not enter an Order at the time Defendant filed the Motion. The Court has already considered that supplemental reply and will grant the Motion for extension at Doc. 169 *nunc pro tunc*.

1    that follow, the Court will grant Defendant's Motion for Leave to File Exhibits
2    Inadvertently not Attached to Supplemental Reply (Doc. 175) and deny Defendant's First
3    and Supplemental Motions for Acquittal or New Trial (Docs. 130, 164, 170).

4    **I.      Background, Procedure, and Evidence at Trial**

5            Starting in June of 1994, Defendant was a letter carrier employed by the United
6    States Postal Service. In 2013 and 2014, Defendant was assigned to the Postal Service's
7    Arcadia Station, which serves several neighborhoods and postal routes in the central
8    Phoenix area. On November 5, 2014, the government indicted Defendant on seven counts
9    of Embezzlement of Mail by Postal Employee, in violation of 18 U.S.C. § 1709, and
10   seven counts of Possession of Stolen Mail, in violation of 18 U.S.C. § 1708. The charges
11   were related to seven specific pieces of mail that were among over 70 recovered by
12   agents of the Postal Service's Office of Inspector General (OIG) in one of three
13   circumstances. Fifty two pieces of undelivered mail were found in Defendant's personal
14   vehicle at the Arcadia Station employee parking lot when OIG agents searched it on June
15   27, 2014.

16           Another 23 pieces of mail were found in the manager's office at the Arcadia
17   Station where Defendant had placed her personal belongings prior to being interrogated
18   by agents after her shift on June 26, 2014. OIG case agent Patrick Longton found that
19   mail late on the night of June 26, several hours after the interrogation of Defendant had
20   ended, at the bottom of a postal cart (called a "U-cart") where Defendant had left her
21   purse and other personal items.[3]

22           Finally, three pieces of mail containing gift cards, in either Mother's Day or
23   birthday greeting cards, had been mailed through the Arcadia Station and were ultimately
24   delivered to the intended addressee. But upon delivery, each of those items had been

25

26   _____

27           [3] A manager at the Arcadia Station found additional mail in the manager's office
     several days later, behind a desk adjacent to where the U-cart was. None of the items of
28   mail found by the manager were charged in the Indictment, and these additional letters
     were not a focus of the evidence presented by either party.

1   opened, the valuables removed, and then resealed. At trial in this matter, which lasted 14

2   days over a period of four weeks, the jury heard evidence including the following.

### A.   The Letters with Missing Gift Cards

4   Ms. Bonnie Griffin testified that on May 27, 2014 she mailed her boyfriend's son,

5   Dano Guendel, a birthday card containing a $50 Target gift card from the Downtown

6   Tempe Post Office. (Tr.[4] 10/29/15 at 132:24–34:21.) Richard Guendel, Dano's father,

7   testified that the envelope and card from Ms. Griffin arrived at his address about a week

8   later, but there was no gift card inside. (Tr. 10/29/15 at 145:19–46:22.) Mr. Guendel

9   testified that when he received the envelope, it had been opened and resealed, and bore

10  not one but two postmarks—one dated May 27, the day Ms. Griffin testified she mailed

11  the card, and another dated June 2, 2014. (Tr. 10/29/15 at 145:24–46:1.) Mr. Guendel

12  contacted the Postal Service about the missing gift card, and eventually spoke to and then

13  met with OIG Agent Longton. Agent Longton testified, and the government introduced

14  internal postal service records showing, that the card Ms. Griffin sent had been routed

15  through the post office's Arcadia Station. (Tr. 10/30/15 at 24:14–21; 47:11–49:25;

16  Tr. Ex. 7.)

17  The government introduced the recovered card and envelope bearing both

18  postmarks and the tracking serial numbers showing its routing through Arcadia Station

19  (Tr. Exs. 2, 8) as well as the receipt showing Ms. Griffin's purchase of the $50 gift card

20  on May 26, 2014, which bore the unique serial number of the card. (Tr. Ex. 1.) From that

21  serial number, Agent Longton was able to track the use of that card through Target

22  business transaction records, which the government introduced at trial. (Tr. Ex. 9.) The

23  records showed the card was redeemed at a Target store in Tolleson, Arizona at 7:23 p.m.

24  on May 31, 2014—four days after Ms. Griffin mailed the birthday card, and several days

25  before it arrived at the Guendel home missing the Target gift card. (Tr. Ex. 9.) The Target

---

27  [4] The Court will denominate citations to the trial transcript with the abbreviation

28  "Tr.," followed by the date and the page and line number(s). It will denominate citations
    to trial exhibits by the abbreviation "Tr. Ex.," followed by the trial exhibit number, and if
    necessary, a page number within the exhibit.

transaction records show that, immediately after the gift card redemption, at 7:25 p.m., a customer at the same register used a personal Visa credit card with account number ending in 0382 in a separate transaction. (Tr. Ex. 9.) The Visa card that was used was issued by Wells Fargo Bank to a Melissa Robertson at an address on West Hilton in Tolleson, Arizona. (Tr. Ex. 12.) A Target security video of the cash register, which Agent Longton obtained and the government placed in evidence, shows in clear detail the person conducting both the 7:23 p.m. gift card transaction and immediately thereafter the 7:25 p.m. Visa card transaction, followed by her exit at 7:26:06 p.m. (Tr. Ex. 10.) Additional video surveillance of the store exit shows a clear image of that person leaving the transaction register and heading out the door, directly to and then past the camera. (Tr. Ex. 11.) The woman in the videos carried with her a large white purse with horizontal brownish black stripes, brown top trim and brown handles. (Tr. Exs. 10, 11.)

The government introduced Arizona Department of Motor Vehicle records for a Melissa Robertson at the same West Hilton address in Tolleson, including her driver license photograph. (Tr. Ex. 13.) The videos from the Target store show a woman bearing a striking resemblance to Melissa Robertson's driver license photograph. The government also introduced DMV and Postal Service employment records showing that Defendant, Denise Robertson, lived at the same West Hilton address in Tolleson as did Melissa Robertson, and was Melissa Robertson's mother. (Tr. Exs. 14, 15.) The records also showed that Defendant was employed at the time by the United States Personal Service and was assigned to its Arcadia Station.[5] Additional Postal Service timekeeping records indicated that Defendant was on duty as a letter carrier at the Arcadia Station on May 28, 2014, the day after Ms. Griffin mailed the Guendel letter and the date it likely was routed through Arcadia Station. (Tr. Ex. 17 at 97; Tr. 10/30/15 at 51:9–53:17.)

The government introduced evidence of Agent Longton's investigation of two other letters that upon mailing through the Arcadia Station originally contained gift cards;

---

[5] Agent Longton testified that he confirmed Melissa Robertson does not and did not work for the Postal Service.

both of those letters were significantly delayed, and both ultimately were delivered without the gift cards. Credit card records show that on May 10, 2014, Janeane Del Valle bought a Walmart gift card (the "9959 gift card") and a restaurant gift card, having a combined value of $45, at the Walmart store near the Arcadia Station. (Tr. Ex. 132.)  Ms. Del Valle placed both gift cards in a Mother's Day card for her grandmother, Ms. Flor Pelaez. (Tr. 10/29/15 at 160:2–21.) She testified that around noon on May 10, she placed the envelope, addressed to her grandmother at a Santee, California address and containing the gift cards into the blue mail collection box outside the Arcadia Station. (Tr. 10/29/15 at 161:8–63:12.) The envelope eventually arrived at her grandmother's address in California, with a postmark of June 9, 2014, nearly a month after Ms. Del Valle mailed it, and without either of the gift cards. (Tr. 10/29/15 at 164:13–65:14.) The government introduced the postmarked envelope at trial. (Tr. Ex. 5.)

Similarly, Belinda Villines testified that on May 10, 2014, she mailed a Walmart gift card with a Mother's Day card to her mother, Vangie Durazo, in Silver City, New Mexico, by placing the envelope containing both items in the blue collection box outside the Arcadia Station. (Tr. 10/29/15 at 180:1–82:10.) The government introduced the receipt for the gift card purchase showing the unique tracking number for the card. (Tr. Ex. 3.) The envelope did not arrive at her mother's address until sometime in June, bearing a postmark of June 9, 2014, and missing the gift card. (Tr. 10/29/15 at 183:7– 84:9.) The government introduced the envelope and Mother's Day card. (Tr. Ex. 4.)

As part of his investigation, Agent Longton contacted Walmart, provided them with the unique identifier for the gift card purchased by Ms. Villines, and requested information on when and where that card was used. (Tr. 11/2/15 at 126:21–128:17.) The government introduced Walmart transaction records indicating the card Ms. Villines bought was used on May 27, 2014, in a west Phoenix area Walmart store. (Tr. Ex. 132.) The Walmart records showed that in the same transaction another Walmart gift card was also used. (Tr. Ex. 132; Tr. 11/2/15 at 128:20–23.) The records indicate the other card used was purchased with a credit card ending in 0697. (Tr. Ex. 132; Tr. 11/2/15 at 129:5–

11.) Agent Longton obtained account records for that credit card and learned it was issued by California Coastal Credit Union to Ms. Del Valle. (Tr. 11/2/15 at 129:12–18; Tr. Ex. 6.) Walmart also provided video of the May 27, 2014, transaction in which the Walmart cards purchased by Mses. Del Valle and Villines were redeemed. The video shows the same woman who appeared in the May 31, 2014 Target video scanning and swiping two separate gift cards at Walmart. (Tr. Ex. 133.) The woman is carrying the same large white purse with the horizontal brownish black stripes and brown edging and strap as was shown in the May 31, 2014 Target videos. (Tr. Ex. 133.) The government also introduced postal service personnel records showing Defendant was on duty at Arcadia Station on May 10, 2014, the day both Ms. Del Valle and Ms. Villines put their mail in the collection box outside the station. (Tr. Ex. 17.)

### B.     Test Letters and Surveillance of Defendant at the Arcadia Station

Agent Longton testified that, having 1) identified the user of the three possibly stolen gift cards from the Guendel, Durazo and Pelaez letters, 2) determined that she was the daughter of and lived with a postal carrier assigned to the Arcadia Station, and 3) determined that all three letters passed through Arcadia Station on days in May 2014 when that postal carrier—the Defendant—was on duty at Arcadia Station, he decided to conduct surveillance of Defendant while at work. (Tr. 10/30/15 at 77:3–17.) Agent Longton, accompanied by Agent James Gill, arrived at Arcadia Station on the afternoon of June 18, 2014 and went to the lookout gallery ("LOG"), a concealed observation gangway used by agents to covertly observe employees suspected of misconduct. Agent Longton testified that while waiting for Defendant to return from her route, he saw a postal employee approach the collection hamper for incoming mail collected by carriers on their route and yet to be postmarked, sorted or otherwise processed. (Tr. 10/30/15 at 77:23–78:15.) Agent Longton testified he saw the employee remove a red letter from the collection hamper. (Tr. 10/30/15 at 78:15–19.)

Agent Longton testified that he called the Arcadia Station supervisor to learn who the employee was because carriers had no reason to remove mail from the collection

1    hamper.[6] (Tr. 10/30/15 at 78:19–79:7.) The supervisor identified the employee as

2    Defendant, Denise Robertson, who had come in through a door other than the one Agent

3    Longton had expected. (Tr. 10/30/15 at 78:21–23.) Agent Longton watched Defendant

4    take the red letter from the collection hamper to her workstation, but neither he nor Agent

5    Gill could determine what she did with it, so they took no action that day. (Tr. 10/30/15 at

6    81:3–11.)

7         The agents learned from Arcadia Station management that Defendant would work

8    on June 26, 2014, and prepared to surveil and record her actions on that day. (Tr.

9    10/30/15 at 86:20–23.) Agent Longton testified that he went to the Arcadia Station at

10   about 8:00 a.m. on June 26, 2014, to watch Defendant handle her delivery point sequence

11   (DPS) mail before going on her delivery and collection route. (Tr. 10/30/15 at 112:4–

12   13:21.) DPS mail is presorted for the carrier on each route, and each carrier picks it up

13   from a DPS bin already in the order of addresses along the carrier's route. (Tr. 10/30/15

14   at 112:4–13:21.) Defendant was assigned route 1807 on June 26, 2014. Agent Longton

15   testified he saw Defendant take her own DPS mail for route 1807, and he saw her also

16   remove two letters that looked to him "like a greeting card type letter, a letter that might

17   contain something of value," from a neighboring DPS tray situated next to the 1807 DPS

18   tray—either route 1806 or 1808—and put them in with her own mail. (Tr. 10/30/15 at

19   114:3–15:7.) Agent Longton testified that under Postal Service policy, there was no

20   reason for a carrier to take individual letters from a neighboring carrier's DPS tray. (Tr.

21   10/30/15 at 116:4–7.)

22        Agents Longton and Gill also prepared several "test letters," which are letters that

23   appear like any other actual mail, addressed to real addresses and displaying actual

24   postage, and containing valuables. (Tr. 10/30/15 at 86:24–87:14.) Agents typically have

---

26   [6] During the course of trial, at least seven witnesses, including three agents, two
27   postal supervisors, one carrier trainer, and one postal union representative called by the
     defense, testified that there was no reason for carriers to remove mail from the collection
     hamper, no reason for a carrier to return to the hamper after dumping their collected mail
28   into it, no reason to return to the hamper multiple times, or some variation of this
     understanding.

the test letters placed in locations where the suspected carrier will have access to them, to see if he or she might steal the mail. (Tr. 10/30/15 at 87:15–21.) The government introduced copies of the seven test letters as of the time they were prepared, along with their inventory preparation sheets and photocopies of the cash or other valuables placed inside them. (Tr. Exs. 21–27.) Among those was an envelope addressed to Angela Sanfelippo in Milwaukee, Wisconsin, that contained a greeting card with a twenty-dollar bill in it. (Tr. Ex. 27.) Agent Longton testified that around 2:00 p.m. on June 26, 2014, accompanied by Agent Gill, he placed the Sanfelippo test letter in a group mailbox for pick up at 6115 Hollyhock Street in Phoenix, a collection point along delivery route 1807, the route Defendant was assigned that day. (Tr. 10/30/15 at 115:10–16:3; Tr. Ex. 28; Exs. 30–32.) Agent Longton testified that the carrier assigned to the route would have the key to collect all outgoing mail left in the group collection box that neighbors would deposit. (Tr. 10/30/15 at 126:8–17.) He also testified that before he placed the Sanfelippo test letter in the collection box, he checked the neighbors' incoming delivery boxes to ensure there was not mail yet delivered, indicating the Defendant had not yet delivered to the neighborhood box. (Tr. 10/30/15 at 126:18–23.)

The agents gave the other six test letters to an Arcadia Station supervisor with instructions to place them in the collection hamper when Agent Longton called and told him to do so. (Tr. 10/30/15 at 121:15–22:1.) Among those test letters was a reddish pink greeting card type envelope bearing two liberty bell stamps and addressed to a Laura Hattabaugh in Parker, Colorado, containing $25 cash; a bluish purple greeting card type envelope addressed to a Belinda Lawrence in Phoenix, containing a Walmart gift card; and a bright blue greeting card type envelope addressed to a Lisa Kintzler in Las Vegas, containing $40 in cash. (Tr. Exs. 21–23.)

Upon Defendant's return to the Arcadia Station after completing her route that afternoon, Agents Gill and Longton had returned to the LOG to observe and to make video recordings of Defendant's actions. There they met Agent Schear, who assisted with surveillance. The government introduced a 31-minute video recording of Defendant on

the Arcadia Station mail room floor starting shortly after she returned from her route, sometime after 3:00 p.m. (Tr. Ex. 34.)[7] In the video, Defendant can be seen approaching the outgoing collection hamper at least three separate times, in each case rifling mail already in the hamper, removing multiple items, and leaving the hamper with unprocessed outgoing mail in her possession. After her first trip, she can be seen leaving the mailroom floor and going out the door with mail. At that point, Agent Longton called the station supervisor and had him place the last six test letters into the collection hamper in various places. (Tr. 10/30/15 at 137:23–38:1.) This included the Hattabaugh test letter.

Defendant can be seen on the video returning to the work floor and on her second trip to the hamper, she brings outgoing mail she had collected on her route and dumps it from a tub in one section of the hamper, and then removes several pieces of mail from another section of the hamper, places them in the handheld tub and eventually returns to her work station with the tub and the mail. (Tr. Ex. 34.) During this visit to the collection hamper, the video shows her removing from the hamper an envelope the same size, shape and reddish pink color as the Hattabaugh test letter, with the same two liberty bell stamps in the upper right corner. (Tr. Ex. 34.) Agent Longton can be heard on the video whispering, "that's my test." (Tr. Ex. 34.) The video shows Defendant holding that letter against the inside of the postal tub she is carrying, collecting several other brightly colored envelopes and taking them back to her work station. (Tr. Ex. 34.) At her work station, the video shows Defendant bundling some of the mail between a magazine and a blank paper, putting the bundle down at her station momentarily, then picking it up and putting it into a large white purse with horizontal brownish black stripes and brown trim and handles, which she was keeping in a large cart, and then covering the opening of the large purse with a smaller black purse. (Tr. Ex. 34.)

---

[7] The government also introduced separate excerpts from this full-length video, including slow motion videos of certain of Defendant's actions, still shots lifted from the video, and one video taken from a different angle on another agent's cell phone. (Tr. Exs. 35–38, 211, 214–19, 222–28.)

On her third and final trip to the collection hamper, the video shows Defendant taking several more brightly colored larger greeting card type envelopes from it and placing them in the postal tub she is carrying. The video shows multiple instances of Defendant taking an apparent greeting card in combination with a piece of plain white mail—presumably commercial mail—on top of the card, throwing both items into the tub, and then removing the commercial mail and throwing it back into the hamper, leaving only the brightly colored greeting card envelopes in her mail tub. Other times Defendant simply picks individual brightly colored envelopes out of the hamper by themselves and throws them into the tub. One of the envelopes clearly visible on the video from this third trip to the hamper is the same bright blue as the Kintzler test letter. The video shows Defendant then return to her work station, place the tub with the mail she took on the desk, and continue sorting other items. After several minutes, Defendant removes the smaller purse from on top of the larger one, lifts the tub containing the unprocessed greeting card type mail, grabs the contents and bands them, places them in the larger purse, and replaces the smaller purse on top of it.[8] She then picks up the larger purse and heads for the exit. The video ends there.

Agents testified that as Defendant began to leave the work floor and head toward the employee parking exit they left the LOG to intercept her, losing sight of her for a short time. When Agents Longton and Schear contacted Defendant, she was not at or near the exit, but rather was closer to the middle of the work floor, and she no longer was holding her purses or the mail tub. (Tr. 10/30/15 at 148:6–24.) The agents placed Defendant under arrest, but did not apply handcuffs. (Tr. 10/30/15 at 148:6–24.) They scanned the work floor for the purses and located them on a carrier ledge near the exit, in a plastic postal tub or tray. (Tr. 10/30/15 at 149:2–5, 163:14–16.) The agents testified that they did not take possession of Defendant's purses or the tub they were in, but had her

---

[8] The view of this transaction is partially obstructed in the full length video, Trial Exhibit 34, but the companion video taken by Agent Schear and introduced as Trial Exhibit 38 is shot from a nearly opposite angle and clearly shows Defendant putting the bundle in her purse while it is still in the mail tub and then putting the smaller purse over the opening of the larger purse.

carry them with her as she accompanied them to the station manager's office. (Tr. 10/30/15 at 163:21–64:6.) There, Agent Longton instructed Defendant to place the tub and her purses in a postal cart situated next to the wall in the manager's office. (Tr. 10/30/15 at 165:13–67:23.) The postal cart was made of spaced metal bars and had no canvas or material covering. (Tr. 10/30/15 at 165:13–67:23.) Agent Longton testified he turned away from Defendant and could not see her hands for "a few seconds" as she placed her belongings in the cart. (Tr. 10/30/15 at 165:13–167:23.)

With Defendant's permission, Agents Longton and Gill searched Defendant's purse three times and found no mail. (Tr. 10/30/15 at 166:17–67:10.) Agent Longton then returned to the work floor to search for the bundles of mail he had previously seen Defendant handle. He testified he searched for over an hour but found none. (Tr. 10/30/15 at 167:13–23.) Agents also arranged for a Phoenix police officer to perform a search of Defendant's person and clothing, which yielded no mail. Thereafter, at around 6:00 p.m., Agent Longton released Defendant, but did not allow her to take her purse, and agents were assigned to maintain surveillance in the employee parking lot over her car while he sought a warrant to search it. (Tr. 10/30/15 at 174:19–25.)

## C.     Seizures from Manager's Office Cart and Defendant's Car

Agents Schear, Gill, Cross and Longton each testified that they and others took shifts surveilling Defendant's car in the Arcadia Station employee parking lot over the night of June 26, 2014 and the morning of June 27 until the search warrant was obtained and the search executed. Agent Longton had the 9:00 p.m. to 1:00 a.m. shift, and testified that he left the car alone for "less than five minutes." (Tr. 10/30/15 at 182:22–83:5.) He testified that at about 11:45 p.m. on June 26, he realized he had left Defendant's purse inside the Arcadia Station in the manager's office and went to get it. (Tr. 10/30/15 at 182:22–83:5.) Agent Longton testified that when he returned to the office,

> I saw this purse in the chair. In front of me I saw the hamper [] and I thought to myself we could not find the mail on the workroom floor. The mail had to be in that hamper so I walked over to the hamper and I moved

that top tray [] and I looked down and I saw two bundles of mail sitting at the bottom of that hamper."

(Tr. 10/30/15 at 184:11–17.) The government introduced a photograph of the two bundles of mail at the bottom of the cart against the wall of the manager's office, which Agent Longton testified he took immediately upon seeing them. (Tr. Ex. 43.) It also introduced the 23 pieces of mail found in those two bundles. (Tr. Exs. 44–66.) Among those letters were the Hattabaugh test letter, the Kintzler test letter and the Lawrence test letter that the station supervisor had placed in the collection hamper at Agent Longton's direction earlier in the day. (Tr. Exs. 57–59.) All but one of the pieces of mail appear to be greeting card type envelopes, most brightly colored. Only two of the 23 pieces—Exhibits 65 and 66—had been processed and bear post marks; the rest are all unprocessed collected mail.

The government also introduced several slow motion clips of the full length surveillance video of Defendant on the workroom floor at Arcadia Station on June 26. (Tr. Exs. 214–19.) During those clips the viewer can clearly see Defendant removing from the collection hamper and handling several pieces of mail that were later recovered from the U-cart in the manager's office, according to Agent Longton's testimony. Included in the video clip is footage of Defendant taking a light brown greeting card type envelope with what looks like a "Liberty" stamp and a rectangular white return address label, which closely matches the letter addressed to Robbie Moore in Las Vegas, Nevada, that was part of the bundles recovered from the cart. (Tr. Ex. 215 at 0:35–1:32; Tr. Ex. 54.) The clip also shows Defendant taking a white envelope with a distinctive large handwritten address, a return address sticker that is dark on the left and white on the right, and bears a single yellow smiley-face sticker on the lower right front corner. (Tr. Ex. 215 at 1:48–1:53.) The letter Defendant takes in this portion of the video appears identical to the letter sent by Javier Calderon in Phoenix to Que Magazine in Glendale, Arizona, which was later found in the U-cart. (Tr. Ex. 64.)

The video later shows Defendant taking a light purple greeting card type envelope with a unique dark firecracker stamp. (Tr. Ex. 215 at 3:14–3:23.) This appears very

similar to the Belinda Lawrence test letter that Agent Longton prepared and had inserted into the collection hamper, and was later recovered in the manager's office U-cart. (Tr. Ex. 59.) Immediately thereafter, the video shows a clear, extended view of Defendant taking a letter that appears identical to the Hattabaugh test letter as described above. (Tr. Ex. 215 at 3:24–4:24; Tr. Ex. 57.)

Agents obtained a search warrant for Defendant's car the following morning and searched it at about 11:00 a.m. In it, they found an additional 52 pieces of mail, some of it unprocessed and some processed well before its recovery, but much of it processed and postmarked June 25, 2014, the day before Defendant was arrested and her car secured. (Tr. Exs. 78–129.) Agent Longton testified that through his consultation of the route information for Arcadia Station and the Mail History Tracking System (MTHS), he determined that 34 of those 52 pieces of mail were destined for delivery on Defendant's route on June 26, 2014. (Tr. 11/2/15 at 105:1–06:8; Tr. Exs. 17, 28.)

Included in this mail was a letter mailed from Virginia with zip code 22081, addressed to a Jane Ferguson on Rockridge Road in Phoenix, Arizona and postmarked on October 12, 2013. (Tr. Ex. 79.) Based on MTHS and postal delivery service standards, Agent Longton testified, the Ferguson letter should have been delivered on or about October 15 or 16, 2013. (Tr. 11/2/15 at 107:20–24.) Agent Longton also testified that based on Arcadia Station personnel time rings and route designations, Defendant was delivering the mail on route 1832, the route upon which Ms. Ferguson's address falls, on October 15, 2013. (Tr. 11/2/15 at 107:25–08:22; Tr. Ex. 17.)

Also included in the mail found in Defendant's car was a letter from Traverse City, Michigan, postmarked on February 18, 2014, and addressed to Dr. Robert Stern and Lucy Marshall on 53rd Street in Phoenix. (Tr. Ex. 124.) Based on route indices and postal delivery service standards, Agent Longton testified that the letter should have been out for delivery from Arcadia Station on route 1821 on Saturday, February 22, 2014. (Tr. 11/2/15 at 109:10–10:6; Tr. Ex. 17 at 61–62.) Time rings showed that Defendant worked

1   the adjacent route, route 1820, on that day and she worked route 1821 itself the following

2   delivery day, Monday, February 24. (Tr. Ex. 17 at 62.)

3           Finally, among the mail recovered from Defendant's car on June 27 was a package

4   sent from the University of Arizona in Tucson to Ms. Alicia Gavin at a Camelback Road

5   address in Phoenix. (Tr. Ex. 125.) The package bears no postmark because it was sent

6   postage paid, but Delivery Point Sequence records admitted in evidence indicate it was

7   scanned for delivery at the Phoenix letter processing facility on May 22, 2014. (Tr. Ex.

8   130; Tr. 11/2/15 at 111:21–12:4.) Postal records also indicate the package was scanned as

9   out for delivery on May 23, 2014. (Tr. Ex. 130.) Postal DPS records show Ms. Gavin's

10  address was within Arcadia Station along route 1833. (Tr. Ex. 28.) Time rings

11  demonstrate Defendant was assigned to deliver route 1833 on May 23, 2014. (Tr. Ex. 17.)

12          Upon conclusion of the evidence, the jury convicted Defendant of one count of

13  embezzlement of mail by a postal employee and one count of possession of stolen mail

14  each for the following seven pieces of mail discussed above: the Virginia letter addressed

15  to Jane Ferguson (Counts 1 and 8); the Traverse City, Michigan letter addressed to Dr.

16  Robert Stern and Lucy Marshall (Counts 2 and 9); the package from the University of

17  Arizona sent to Alicia Gavin (Counts 3 and 10); the birthday card and Target gift card

18  addressed to Dano Guendel (Counts 4 and 11); the Mother's Day card and Walmart gift

19  card addressed to Vangie Durazo (Counts 5 and 12); the Angela Sanfelippo test letter

20  mailed from the Hollyhock Street group collection box (Counts 6 and 13); and the Laura

21  Hattabaugh test letter inserted in the collection hamper on the Arcadia Station work floor

22  (Counts 7 and 14).

23  **II.      The Motion for Acquittal**

24          Defendant moves for judgment of acquittal notwithstanding the jury's verdict on

25  all 14 counts. In evaluating a Motion for judgment of acquittal under Federal Rule of

26  Criminal Procedure 29, the Court "view[s] the evidence in the light most favorable to the

27  government and determine[s] whether any rational trier of fact could have found the

28  essential elements of the crime beyond a reasonable doubt." *United States. v.*

1   *Christensen*, 801 F.3d 970, 985 (9th Cir. 2015) (citation and internal quotation marks

2   omitted); *see also United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (*en*

3   *banc*). Applying this standard to the case at hand, the evidence presented meets the

4   standard for all elements of each of the 14 counts of conviction.

5        **A.**     **The Jane Ferguson Letter (Counts 1 and 8)**

6        Count 1 charges Defendant with Embezzlement of Mail by a Postal Employee in

7   violation of Title 18 U.S.C. § 1709. To convict Defendant on this Count, the government

8   had to prove that 1) Defendant, while working as a Postal Service Employee, was

9   entrusted with or came into possession of the Ferguson letter; 2) the letter was intended to

10   be conveyed by mail; and 3) Defendant stole the letter or thing contained therein. (Doc.

11   126, Jury Instr. 24.)

12        The government met the first element by introducing Postal Service personnel

13   records showing Defendant was working at Arcadia Station on October 15, 2013,

14   delivering mail on the 1832 route, which was the route the Ferguson letter was on. It also

15   introduced the letter itself bearing a postmark of October 12, 2013 in Virginia, and Agent

16   Longton testified that postal service delivery standards called for delivery of such a letter

17   on October 15 or 16, 2013. Based on the above evidence, a trier of fact rationally could

18   have found beyond a reasonable doubt that Defendant came into possession of and or was

19   entrusted with the Ferguson letter during her work as a postal employee delivering the

20   mail on the 1832 route on October 15, 2013.

21        To meet the second element, the government introduced the letter itself bearing a

22   stamp and a postmark in Virginia dated October 12, 2013.  From this alone, a trier of fact

23   rationally could conclude that the sender intended to use the U.S. Mail to convey the

24   letter to Ms. Ferguson. Finally, to meet element three, the government introduced

25   photographs of the Ferguson letter upon seizure from Defendant's car on June 27, 2014,

26   and testimony from agents that it was found in the glovebox of Defendant's car, along

27   with 51 other pieces of mail addressed to persons other than Defendant. A trier of fact

28   rationally could have found this evidence sufficient to show beyond a reasonable doubt

that Defendant stole the Ferguson letter. The Court will deny Defendant's Motion for acquittal as to Count 1.

Count 8 charges Defendant with Possession of Stolen Mail in violation of Title 18 U.S.C. § 1708. To convict Defendant on this Count, the government had to prove that 1) the Ferguson letter was stolen from the mail, post office, letter box, mail receptacle, mail route or other authorized depository; 2) Defendant possessed the Ferguson letter; and 3) Defendant knew the Ferguson letter was stolen. (Doc. 126, Jury Instr. 23.) Regarding the first element, the jury had before it evidence that the letter had been mailed October 12, 2013 to Ms. Ferguson, that it was not in Ms. Ferguson's possession, and that it was found more than eight months later in the personal vehicle of the letter carrier assigned to the route on which it should have been delivered on or about October 15, 2013, along with over 50 other pieces of mail addressed to persons other than that carrier. As to element two, whether Defendant possessed the Ferguson letter, the government's evidence showed its agents found the letter in the glovebox of Defendant's personal vehicle, along with other potentially stolen mail, over eight months after it should have been delivered. From all of this, a jury rationally could have inferred, beyond a reasonable doubt, Defendant knew the Ferguson letter was stolen. The Court will deny Defendant's Motion for acquittal as to Count 8.

### B.     The Stern and Marshall Letter (Counts 2 and 9)

The evidence set forth at trial by the government to prove the elements of Embezzlement (Count 2) and Possession of Stolen Mail (Count 9) with respect to the Stern and Marshall letter are similar to that supporting the Ferguson letter counts. The government introduced testimony that the letter sent from Michigan on February 18, 2014 to Dr. Robert Stern and Ms. Marshall in Phoenix was found in Defendant's car during the June 27, 2014 search. Route listings and postal delivery service standards indicated that the letter should have been out for delivery from Arcadia Station on route 1821 on Saturday, February 22, 2014, and that Defendant worked the adjacent route on that day and she worked route 1821 itself the following delivery day. Agent Longton also

1   testified that during his brief surveillance of Defendant the morning of June 26, 2014, he

2   saw her take two pieces of mail from the sorted DPS mail for the route adjacent to hers

3   for that day. From this Federal Rule of Evidence 404(b) evidence of pattern or plan, the

4   jury could have rationally concluded that Defendant took mail from the sorted DPS

5   bundles for the route adjacent to her own assigned route on February 22, 2014, to include

6   the Stern and Marshall letter, or that she came into contact with it and took it when it was

7   entrusted to her on the following day, when she delivered the 1821 route. The postage

8   and postmark on the letter indicate it was intended for the U.S. Mail. Its discovery in

9   Defendant's car more than four months after it was mailed, together with over 50 other

10   pieces of potentially stolen mail, could lead a finder of fact to rationally conclude it was

11   stolen, and that Defendant possessed it knowing that fact. The Court will deny

12   Defendant's Motion for acquittal as to Counts 2 and 9.

13         **C.**      **The Alicia Gavin Package (Counts 3 and 10)**

14         To prove the elements of embezzlement of mail (Count 3) and possession of stolen

15   mail (Count 10) regarding the Gavin package, the government introduced evidence that

16   the package was mailed by the University of Arizona in Tucson using a U.S. Postage

17   Paid permit number 751, demonstrating that the package was intended to travel in the

18   U.S. Mail. It introduced postal service tracking information showing the package was

19   mailed May 22, 2014, and was out for delivery from the Arcadia Station on route 1833 on

20   May 23, 2014. As set forth above, personnel records admitted showed Defendant was

21   assigned to deliver route 1833 on May 23, 2014. Finally, the government introduced a

22   photograph of the Gavin package upon its seizure from Defendant's car, where agents

23   testified they discovered it during their search on June 27, 2014, more than a month after

24   the package should have been delivered to Ms. Gavin's Arcadia address. The Court will

25   deny Defendant's Motion for acquittal as to Counts 3 and 10.

26         **D.**      **The Dano Guendel and Vangie Durazo Letters and Gift Cards (Counts 4, 5, 11 and 12)**

27

28         The government introduced testimony from Bonnie Griffin that on May 27, 2014,

she put a birthday card containing the Target gift card in the U.S. Mail in Tempe,

Arizona. Similarly, Belinda Villines testified that she put the Mother's Day card in the mail on May 10, 2014 to her mother, Ms. Durazo, containing the Walmart gift card. From this a jury could conclude both pieces of mail were intended to be conveyed by mail. The envelope of the Guendel letter showed a postmark of May 27, 2014 (in addition to a June 2, postmark) and postal tracking records demonstrated that it was routed through the Arcardia Station on May 28, 2014—a day that postal personnel records showed Defendant was working at Arcadia Station. Ms. Villines testified that she dropped the Durazo letter in the outdoor mailbox for collection at the Arcadia Station on May 10, 2014, a day that postal records also show Defendant was on duty there. The government also introduced evidence that the same day Ms. Villines mailed the Mother's Day card and gift card to Ms. Durazo, Janeane del Valle put into the outdoor collection box at Arcadia Station a Mother's Day card containing another Walmart gift card addressed to her grandmother, Flor Pelaez.

Testimony and evidence consisting of the three envelopes and cards were introduced showing that all three cards were delivered, much later than expected, and without the respective gift cards. The government introduced videos and transaction records from the Target store in Tolleson, Arizona and a nearby Walmart in West Phoenix showing Defendant's adult daughter, who also lives with Defendant, redeeming all three gift cards on May 31 (Guendel gift card) and May 27, 2014 (Durazo and Pelaez gift cards), respectively. In all the videos, Defendant's daughter is carrying and using ether the same purse Defendant had on the day of her arrest and surveillance or one identical to it. Defendant had access to all three pieces of mail containing the gift cards at issue on different days she worked. All three gift cards went missing from the three pieces of mail. All three were redeemed by Defendant's adult live-in daughter, who does not work at the post office, but carries either Defendant's purse or one identical to it. The finder of fact could conclude these three facts are nothing more than a highly improbable coincidence. Or the finder of fact could rationally find beyond a reasonable doubt that Defendant took the gift cards. The Court will deny Defendant's Motion for acquittal on

1    Counts 4 (embezzlement of the Guendel gift card), 5 (embezzlement of the Durazo gift

2    card), 11 (possession of the stolen Guendel gift card) and 12 (possession of the stolen

3    Durazo gift card).

4         **D.    The Angela Sanfelippo Test Letter (Counts 6 and 13)**

5         The government introduced testimony through Agent Longton that he and Agent

6    Gill prepared seven test letters on June 26, 2014, including the Sanfelippo test letter,

7    which he placed in an outgoing group collection box along Defendant's route that day.

8    Agent Longton testified the test letter was "real mail" addressed to an actual address and

9    that he thus put it into the mail stream himself.  Agents testified they found it the next day

10   during their search of Defendant's car, which they had secured and surveilled before

11   releasing Defendant the prior evening. From this evidence the jury rationally could have

12   concluded beyond a reasonable doubt that Defendant, while working route 1807, came

13   into possession of the Sanfelippo test letter when she emptied the Hollyhock Street group

14   collection box; that the test letter was intended to be conveyed by mail; and that

15   Defendant stole the letter and put it into her personal vehicle on her return to Arcadia

16   Station after completing her route on June 26, 2014. This would satisfy the elements of

17   Count 6. It also would satisfy the additional elements of Count 13: that the Sanfelippo

18   test letter was stolen, that Defendant knew the letter was stolen, and that she possessed it,

19   either by putting it in her personal vehicle or by not delivering it to Arcadia Station for

20   processing at the end of her route. The Court will deny the Motion for acquittal as to

21   Counts 6 and 13.

22        **E.    The Laura Hattabaugh Test Letter (Counts 7 and 14)**

23        Agent Longton testified that he prepared the Hattabaugh test letter and instructed

24   the Arcadia Station manager to place it in the outgoing mail hamper on the afternoon of

25   June 26, 2014, while Defendant was back from her route but still working. The

26   government introduced a copy of the test letter as prepared. It showed extensive video of

27   Defendant removing what clearly is the Hattabaugh test letter from the collection hamper

28   between 3:30 and 4:00 p.m. that afternoon, placing it in a tub with several other pieces of

mail she had removed from the hamper, and returning to her work station. And it offered testimony from several witnesses that letter carriers have no reason to take mail from the outgoing collection hamper even once, save multiple times.

The videos, taken from multiple angles, also show Defendant bundling mail and putting some bundles in her purse, concealing that mail with another smaller purse, and then leaving with the purses. Agents Longton, Gill and Schear testified that once they intercepted Defendant and found her purses and mail tub, they instructed her to carry those items and accompany them to the manager's office, where they told her to put her items in the U-cart next to the wall near the manager's desk, but that none of them saw her hands the entire time she was so placing the items in the cart. They testified that they searched the Defendant's purses three times and found no mail, then went back to the work floor and searched for an hour, but did not find the bundles. Agent Longton testified that much later that night, while he was on surveillance of Defendant's car in the employee parking lot at Arcadia Station, he returned to the manager's office to retrieve Defendant's purse, thought to look in the U-cart itself for the first time, and at the bottom, saw the bundles containing the Hattabaugh test letter and several other letters identified in the video as Defendant was removing them from the outgoing hamper.

A jury viewing these facts rationally could conclude beyond a reasonable doubt that Defendant embezzled the Hattabaugh test letter, and from that could also infer she knowingly possessed it. Mail matter can be stolen without it having been removed from the post office building. *United States v. Kelley*, 166 F.2d 343, 346 (9th Cir. 1948). The fact that the Defendant diverted and concealed the mail matter is sufficient. *Id.* The jury was so instructed. (Doc. 126, Jury Instr. 26.) The Court will deny Defendant's Motion for acquittal on Counts 7 and 14.

Defendant argues repeatedly that the testimony, and perhaps the acts, of the agents in this matter were not credible, and that this serves as a basis for a judgment of acquittal. But that is not the standard under Rule 29. The standard is whether the evidence when taken in the light most favorable to the government would allow any rational trier of fact

to find the essential elements of the crime beyond a reasonable doubt. *See Christensen*, 801 F.3d at 985. Under that standard, the Motion fails. The jury had before it all of the evidence discussed above. To be sure, it had other evidence, including much testimony by the agents, on both direct and cross-examination, that portrayed the agents and their performance in a poor light at times: investigative reports and prior testimony that was inconsistent on some points as to when and how agents executed certain tasks in the investigation; the agents' decision to allow Defendant to carry and locate potential evidence against her after she was arrested and then not watch exactly what she did during that time; Agent Longton's decision to leave his sole surveillance of Defendant's vehicle on the night of June 26 to reenter the Arcadia Station to retrieve Defendant's purse; his subsequent decision to search the U-cart in the manager's office of the Arcadia Station in the middle of the night, without a witness, where he then found the bundles of mail at the bottom of the U-cart; and a host of related issues.[9] Defendant cross examined all of the agents at length, giving the jury ample opportunity to evaluate their credibility in light of all evidence.

Upon hearing all of this evidence, the jury credited the agents' testimony, as it is entitled to do. It had before it ample evidence to make a rational finding that the elements of all counts were met. Even if the jury did not believe some or all of agents' testimony, it had the benefit of much evidence that came in forms other than agent testimony. That evidence included the extensive surveillance video, which Defendant did not challenge, showing Defendant taking numerous mail items from the collection hamper, including at least two pieces of test mail and several other unique, identifiable pieces of uncharged mail that were among the items Agent Longton testified he later found in the U-cart. Defendant also did not challenge the video and transactional records from Target and Walmart showing Defendant's daughter redeeming the stolen gift cards. The Court will not order acquittal in the face of this evidence.

---

[9] These issues are detailed further in addressing Defendant's Motion for New Trial below.

### III.    Motion for New Trial

Although Defendant does not cite the authority under which she moves for a new trial or the applicable standards for evaluating or granting such a motion, the Court construes her Motion to be brought under Federal Rule of Criminal Procedure 33(a) and (b)(2). Rule 33(a) provides that a criminal defendant may move for a new trial "if the interest of justice so requires." The Court has in a prior Order found Defendant to have met the requirement for timely filing of such a motion or shown excusable neglect justifying a late filing. (Doc. 141.) In her Motion and her Supplemental Motion, Defendant raises the following issues that she argues require a new trial in the interests of justice.

First, Defendant argues that the Court should dismiss the Indictment because the government violated her rights under the Fourth Amendment to the Constitution of the United States and Federal Rule of Criminal Procedure 5(a)(1) because agents placed her under arrest the afternoon of June 26, 2014, and thereafter did not promptly present her to a United States Magistrate Judge without unnecessary delay. (Doc. 164 at 2.) This argument fails. Agent Longton released Defendant at around 6:00 p.m. the evening of June 26, a little more than two hours after arresting her. She was free to go, and did go. No charges, either by Complaint or Indictment, were instituted at that time. There was, therefore, nothing on which to present Defendant to a Magistrate Judge for advice of charges or rights, appointment of counsel, or triggering of any discovery rights. *See, e.g.*, *United States v, Duke*, 409 F.2d 669, 671 (4th Cir. 1969). To the extent Defendant attempts to argue that she was released without charges so the government could avoid providing her discovery in this matter she provides no evidence to support such claim. The Court will deny a new trial, or as Defendant requests, dismissal, on this basis.

Defendant next argues the matter should have been dismissed "based upon Agent Longton's admitted perjury before the grand jury." (Doc. 164 at 4.) She charges that discrepancies between Agent Longton's affidavit in support of the warrant to search her car, his grand jury testimony and his trial testimony constitute such perjury. The first

discrepancy Defendant points out is that "[A]gent Longton's testimony at trial differed materially about how he arrived at Ms. Robertson as a suspect." (Doc. 164 at 10.) As support for her argument, Defendant notes that in his affidavit, and before the grand jury, Agent Longton never mentioned performing an internet search to determine that Defendant lived at the same address as Melissa Robertson. At trial, Agent Longton testified he performed such an internet query, and then checked postal employee records to learn Defendant worked at Arcadia Station. In his affidavit, Agent Longton merely stated, "[t]he affiant learned Denise Robertson has a daughter named Melissa Robertson," and

> Your affiant determined there was a Denise Robertson, Letter Carrier, who worked at Arcadia Station, Phoenix, Arizona. Postal records revealed Denise Robertson resided at [] W. Hilton Street, Tolleson, Arizona 85353. Your affiant determined a person named Melissa Robertson resided at the same address.

In the grand jury, Agent Longton testified that

> I checked the employee database, and we have no Melissa Robertson working for us . . . . And when I checked the records at Arcadia Station, we had a Denise Robertson that worked there.

For the Court to find perjury occurred, it must conclude Agent Longton or the government had a willful intent to provide false testimony. *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). The Court sees no willful intent to provide false testimony in these compared statements. As a threshold matter, it sees no false statements to begin with. Agent Longton's three sworn statements related the same story of how he identified Defendant as a suspect. In each statement, he identified Melissa Robertson as the user of the stolen gift cards. He determined she did not work for the post office. He learned Denise Robertson was Melissa Robertson's mother, or that Melissa was Denise's daughter, and they lived together. And he learned that Denise Robertson was employed by the Postal Service at Arcadia Station. That one account included reference to an internet search, may be a difference, but it is not a material one, and it is at worst an inconsistency. Confusion, mistake, faulty memory and inconsistent testimony do not

amount to perjury. *United States v. Gonzalez*, 800 F.2d 895, 899 (9th Cir. 1986). Moreover, if this inconsistency might have borne on Agent Longton's credibility, the jury was made aware of it. Defendant's counsel cross examined him at length on each inconsistency pointed out in Defendant's Supplemental Motion, much was made of each inconsistency in closing argument, and the jury had the opportunity to evaluate Agent Longton's credibility in light of the inconsistencies.

Defendant's additional claims of perjury by Agent Longton similarly fail. Her claim that "Agent Longton in one place says that Ms. Robertson put the tray with her purse in the U-cart, in another, he says he told her to put the purse in the U-cart," (Doc. 164 at 10), does not show any false or untrue statement, does not show any intent to make a false statement, and is not material in any event. To the extent Defendant argues that Agent Longton changed his story, again, her counsel had ample opportunity to bring out variations in his statements, and she took that opportunity.

Defendant also charges error against Agent Longton for "conduct[ing] hasty and second rate surveillances" at Arcadia Station, failing to record or selectively recording some surveillances and failing to follow "appropriate and standard investigative techniques." (Doc. 164 at 10–11.) She also argues that Agent Longton was the only witness to certain alleged conduct by Defendant, such as the allegation that on the morning of June 26, 2014, Defendant took two pieces of mail from the DPS mail bundle set aside for the carrier on an adjacent route. (Doc. 164 at 11.) Defendant also raises Agent Longton's conduct in searching the Arcadia Station manager's office for the missing mail at 11:45 p.m. with no other witnesses, and in not submitting that mail for fingerprint analysis. (Doc. 164 at 11–12.)

None of this constitutes perjury, despite Defendant making these allegations in the section of her Motion headed, "The Indictment Should Have Been Dismissed Based Upon Agent Longton's Admitted Perjury Before the Grand Jury; Therefore, Ms. Robertson's Conviction Must Necessarily be Set Aside, With an Entry of a Judgment of Acquittal." In any event, to the extent any of Agent Longton's actions set forth above

1    might have borne on his credibility with the jury, again, Defendant's counsel examined

2    him at length about each of these issues at trial, and then highlighted them in closing

3    argument. The jury had a full opportunity to evaluate Agent Longton's credibility,

4    testimony and actions. The Court finds no evidence of perjury and thus will not order a

5    new trial on such grounds.

6          Defendant raises an additional allegation of suborning perjury against the

7    government. At trial Agent Longton testified that Arcadia Station supervisor Henry

8    Almanza called him on June 25 to tell him Defendant would work the next day, and

9    Mr. Almanza later testified that he did not know Defendant was working on June 26 and

10   did not call Agent Longton to tell him so. According to Defendant, this conflicting

11   testimony constitutes perjury and the Court should exercise its policing power to enter a

12   judgment of acquittal or grant a new trial because the government knew or should have

13   known Agent Longton's testimony was false. To prove a due process violation based on

14   the use of perjured testimony requires 1) a demonstration that testimony was actually

15   false; 2) a showing that the prosecution knew or should have known the testimony was

16   false; and 3) that the false testimony was material. *United States v. Houston*, 648 F.3d

17   806, 814 (9th Cir. 2011). Defendant's *Houston* claim fails under all three prongs of the

18   test. In the first place, it is unclear from this conflicting testimony who is wrong—Agent

19   Longton or Mr. Almanza. In any event, there is no showing that either witness intended

20   to make a false statement or that the government knowingly introduced a false statement.

21   Trials are about individual witnesses' memories, and the jury's opportunity to evaluate

22   them. Memories differ. Memories are sometimes wrong. That does not equate to perjury

23   without intent. Moreover, there is no showing that the discrepancy between Agent

24   Longton's and Mr. Almanza's testimony on who told Agent Longton Defendant would

25   be working on June 26 was material to the jury's decision. Finally, the difference in

26   testimony between the two witnesses on this point was evident for all to see, and as

27   pointed out in the government's Response, whether discrepancies were the result of lies

28

1    or errors is a question properly left for the jury. *See United States v. Zuno-Arce*, 44 F.3d

2    1420, 1423 (9th Cir. 1995).

3         Defendant next argues she is entitled to a judgment of acquittal because she

4    alleges the government violated Federal Rule of Evidence 615 when it allowed agent

5    witnesses Schear and Gill to review the transcript of an evidentiary hearing in this matter.

6         Rule 615 by its own terms addresses exclusion of witnesses from the courtroom

7    during a proceeding. It does not speak to any additional measures a trial court may

8    impose outside the Rule, and it is silent as to any effect on subsequent proceedings.[10]

9    Defendant is correct that the Court had in mind a concern that fact witness testimony at

10   trial could be tainted if such witnesses were exposed to testimony about similar issues at

11   the evidentiary hearing, and the Court would have preferred if no witness at trial had been

12   exposed to the testimony of other witnesses at the evidentiary hearing. But Rule 615 does

13   not in its text or comments provide for such additional measures and the Court did not

14   order any such additional measures under its general authority to manage litigation,

15   beyond excluding potential witnesses at trial from hearing other fact testimony at the

16   evidentiary hearing. Had the Court expressly precluded any potential trial fact witness

17   from reviewing transcripts, the government would have committed a violation of such

18   order. But there was no such order, and as stated above, Rule 615 does not fill in any

19   such gap.

20        The Court therefore did not and does not find any sanction to be warranted against

21   any actor for the government's sharing of the evidentiary hearing transcript with Agents

22   Schear and Gill before trial. To the extent the Court had concerns about possible witness

23   tainting, it addressed those concerns at trial by allowing Defendant to cross examine

24   Agents Gill and Schear before the jury about their exposure to the transcript. The jury

---

26   [10] Defendant cites *United States v. Engelmann*, 701 F.3d 874 (8th Cir. 2012), in support of her argument that the obligations under Rule 615 carry forward from one hearing to another proceeding. This reliance is faulty. *Engelmann* dealt with one agent sharing what had transpired with another agent before that agent's testimony at the same hearing the first agent had already testified in. *Engelmann* did not address a witness sharing testimony from one hearing with a witness in a subsequent proceeding. The out-of-circuit case is inapposite here.

thus could make a credibility determination as to Agents Schear and Gill with knowledge of the exposure. The Court will deny the Motion for acquittal or *vacatur* of conviction and dismissal of the Indictment on this basis.

Finally, Defendant moves for a new trial based on the argument that she was disadvantaged by a several day interruption of her cross-examination of Agent Longton, by the Court's limiting the length of her cross-examination once Agent Longton returned, and by the jury overhearing discussions at sidebar about the time taken by counsel in cross-examination. Defendant asserts that the jury asked a question that "nearly parroted the Court's characterization of the defense's time and case." (Doc. 164 at 20.) Defendant asserts in her Motion that the Court believed the defense was wasting the Court's time, and asserts that if the jury was influenced by this belief, Defendant was denied due process. (Doc. 164 at 20.)

The government conducted an approximately eight-hour direct examination of Agent Longton over parts of three days. After about six and a half hours of cross-examination by Defendant over parts of two days, on the morning of November 4, 2015, the government informed the Court that Agent Longton had taken ill, had to be sedated due to the pain from the illness, and likely would be unavailable for at least three trial days—the balance of the second week of the trial. The Court ordered the government to call its next witnesses and proceed with its case in chief until either Agent Longton could return for Defendant to complete her cross-examination of him or it became clear he could not return, whereupon the Court would consider other options. Agent Longton did return the following Monday, November 9, 2015, and Defendant's counsel completed her cross-examination of him. By the time Agent Longton returned, the government had rested subject to completion of his testimony, and the defense had begun its case.

Before bringing in the jury and resuming with the Agent Longton cross, the Court advised that due to the length of examination to that point, it would limit Defendant's remaining cross to an additional hour and 45 minutes, and would limit any redirect by the government to one hour. The Court observed it would impose the limits on both parties

1    under its authority to manage the trial and upon a finding that 1) both parties would have

2    a roughly equal amount of time in aggregate examining the witness; 2) that limit would

3    be consistent with defense counsel's earlier representation of how much time she needed;

4    and 3) with over nine hours total time to cross examine Agent Longton, Defendant was

5    afforded the ability to thoroughly explore any bias or other impeachment. No party

6    objected to the limits at that time.

7          When defense counsel had exceeded her time limit for completing cross-

8    examination by more than half an hour, the Court stated, in front of the jury, "Ms. Benes,

9    you have about a minute to wrap it up." (Tr. 11/9/15 at 55:10–11.)[11] After brief additional

10   questioning, counsel asked for a sidebar and requested more time, which the Court

11   declined to grant, responding that counsel had already exceeded her own estimate, but

12   allowing her a few questions to wrap up. (Tr. 11/9/15 at 57:2–60:25.) In all, Defendant's

13   cross-examination of Agent Longton lasted just less than ten hours.

14         The following day, Defendant recalled Agent Longton as a witness in her case and

15   examined him for a total of three additional hours. The Court did not limit this

16   examination.

17         Defendant was not prejudiced by the interruption of Agent Longton's cross-

18   examination during his medical emergency. Courts frequently take witnesses out of order

19   to accommodate scheduling and logistical issues, and Federal Rule of Evidence 611(a)

20   provides that

21         The court should exercise reasonable control over the mode and order of
22         examining witnesses and presenting evidence so as to:

      (1)    make those procedures effective for determining the truth;
23         (2)    avoid wasting time; and
      (3)    protect witnesses from harassment or undue embarrassment.

24

25

26

27

28        [11] This is the statement Defendant characterized in her Supplemental Motion as the
Court "cutting her off" in front of the jury. (Doc. 164 at 20.)

Fed. R. Evid. 611(a). Taking witnesses out of order to accommodate Agent Longton's medical condition was an appropriate exercise under Rule 611 and did not prejudice Defendant. Nor was Defendant prejudiced by any limitation the Court placed on the length of her cross-examination of Agent Longton. The Court allowed Defendant to cross examine Agent Longton for nearly ten hours—longer than the government took to conduct its direct examination of him. That amount of time is sufficient for Defendant to explore all of the witness's potential biases. "No Confrontation Clause violation occurs 'as long as the jury receives sufficient information to appraise the biases and motivations of the witness.'" *United States v. Larson*, 495 F.3d 1094, 1109 (9th Cir. 2007) (*en banc*) (Graber, J., concurring, but writing for a majority of the court on this point) (quoting *United States v. Shabani*, 48 F.3d 401, 403 (9th Cir. 1995))

A defendant's right to cross examine adverse witnesses is not unlimited. *Hayes v. Ayers*, 632 F.3d 500, 518 (9th Cir. 2011). "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (internal quotations and citations omitted). When some inquiry is permitted, "trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination." *Van Arsdall*, 475 U.S. at 679. In any event, Defendant avoided any limitation the Court placed on her cross-examination of Agent Longton when she recalled him during the defense case and examined him without limitation for almost three more hours.

Finally, for the reasons set forth in the Court's prior Order (Doc. 141), Defendant has made no showing that the jury heard any comment made at sidebar by the Court, or, as a preliminary matter, that the Court made any comment that could have prejudiced Defendant in any way if a juror heard it. Defendant's argument that the jury may have overheard and been affected by comments made at sidebar is extraordinarily speculative and, at this point, seven months after conclusion of the trial and dismissal of the jurors, incapable of determination.

1    Defendant's argument also is simply not plausible in light of the known facts.
2    During trial, the Court reviewed daily the exchanges at sidebar, in part because it and
3    court staff had to repeatedly advise counsel for Defendant to keep her voice down while
4    at sidebar. (*E.g.*, Tr. 11/19/15 at 59:1–9.) It is thus familiar with the record on this point,
5    and while many juror questions are reflective of questions counsel asked various
6    witnesses in open court, or argument by counsel in open court, a review of all questions
7    submitted by the jury during trial in this matter yielded no juror-submitted question
8    whose content suggests it was the product of the jury overhearing anything stated during
9    a bench conference. The only juror-submitted question that appears to address the issue
10   Defendant raises in her Supplemental Motion—regarding "the time taken in cross
11   examination"—reads as follows: "Judge—when the attorneys get 'off topic' or redundant
12   are you able to redirect them? In consideration of the jurors' time?" (Doc. 128 at 59.)
13   This question does not suggest in the least that the juror asking it was motivated by
14   anything they may have heard from a sidebar discussion involving the pace of trial.
15   Rather, it appears to reflect the juror's independent concern that, at that point—Day 10 of
16   trial—the matter was two to three days beyond the estimated length of trial provided by
17   counsel and relayed to the jurors during the *voir dire* process and was not yet concluded.
18   Moreover, the question came at the conclusion of the testimony of a witness who had
19   been examined for two and one half days by all parties during the government's case-in-
20   chief, and then had just completed an additional day of examination after being recalled
21   in Defendant's case. It is quite reasonable to conclude that the juror who asked the
22   question—or any juror—would have had ample knowledge at that point to have
23   independently formed a concern over the pace of trial and formulated such a question.
24   Indeed, given the repetitive nature of the questioning of this and other witnesses, a juror
25   or jurors may have legitimately and independently had this concern even if the trial were
26   on schedule. Moreover, the question addressed "the *attorneys* get[ting] off topic"
27   (emphasis added). It did not single out any side or any attorney. This is consistent with
28   the fact that the Court advised the government to move matters along and be efficient at

1   least as often as it raised the issue with the defense. (*E.g.*, Tr.11/2/15 at 90:11–18; 100:7–

2   11.) The Court will deny Defendant's Motion for new trial based on this issue as well.

3   **IV.   Conclusion**

4       Defendant raised to the jury what she believed were the shortcomings of the

5   investigation and of the government's case. As the Court observed at the evidentiary

6   hearing in August 2015, the government's case had warts, about which its witnesses

7   would have to answer many questions before a jury. Defendant asked those questions at

8   trial. The jury still concluded the government had proven its case beyond a reasonable

9   doubt. In addition to the evidence provided by the government's investigative agents,

10  whose credibility Defendant attacked and about whose testimony the jury had to make a

11  credibility determination, the government introduced substantial video surveillance

12  whose reliability was not attacked, and which clearly shows Defendant taking at least one

13  of the charged letters, the Hattabaugh test letter, out of the unprocessed mail hamper,

14  notwithstanding Defendant's arguments to the contrary, without reason or excuse. The

15  Court concludes, as it did in ruling on Defendant's Rule 29 Motion at trial, that the

16  government had presented evidence sufficient that a trier of fact rationally could have

17  found each element of the 14 counts proven beyond a reasonable doubt.

18      Defendant has not shown any of the misconduct she alleges the government or its

19  witnesses engaged in during the investigation or trial in this matter. Nor has she shown

20  any unfair prejudice to her or any other factor that would cause the Court to conclude the

21  interest of justice requires a new trial. For these reasons,

22      **IT IS ORDERED** denying Defendant's First Motion for Acquittal, First Motion

23  for New Trial, First Motion for Leave to Supplement Motions (Doc. 130).

24      **IT IS FURTHER ORDERED** denying Defendant's Supplemental Motion for

25  Acquittal, Supplemental Motion for New Trial (Doc. 164).

26      **IT IS FURTHER ORDERED** granting *nunc pro tunc* to April 19, 2016,

27  Defendant's First Motion to Extend Time to Supplement Reply to Government's

28  Response (Doc. 169).

1    **IT IS FURTHER ORDERED** granting Defendant's First Motion for Leave to

2  File Exhibits Inadvertently not Attached to Supplemental Reply (Doc. 175).

3    **IT IS FURTHER ORDERED** affirming the sentencing date of July 20, 2016

4  (Doc. 184).

5    Dated this 21st day of June, 2016.

6

7    _____

8    Honorable John J. Tuchi
     United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28